The **NORTHERN TRUST COMPANY,** Plaintiff–Counterdefendant–Appellee,

v.

**Frank E. PETERS and Marta Chaikovska, Defendants–Counterplaintiffs–Appellants.**

No. 94–2657.

United States Court of Appeals, Seventh Circuit.

Argued March 27, 1995.

Decided Oct. 20, 1995.

Gary E. Dyal (argued), James G. Bonebrake, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Plaintiff–Appellee.

Lawrence C. Rubin (argued), Cary E. Donham, Shefsky, Froelich & Devine, Chicago, IL, Alexander D. Kerr, Jr., Bruce L. Wald, Richard W. Hillsberg, Jeffrey B. Rose, Tishler & Wald, Chicago, IL, for Defendants–Appellants.

Before EASTERBROOK and KANNE, Circuit Judges, and STIEHL,* District Judge.

KANNE, Circuit Judge.

Defendants-appellants Frank E. Peters and Marta Chaikovska filed a lengthy and excessively detailed amended counterclaim against plaintiff-appellee The Northern Trust Company alleging various injuries stemming from eight counts of wrongful conduct. This appeal requires us to review the decision of the district court that dismissed the amended counterclaim under Fed.R.Civ.P. 12(b)(6) as barred by the applicable statutes of limitation. For the purpose of deciding this appeal, we summarize Peters's[1] recitation of the facts as set forth in the amended counterclaim and exhibits. We take the factual allegations as true and adopt in our analysis all reasonable inferences in favor of Peters.[2]

Several counts incorporate the same factual allegations to assert different theories of recovery. Different limitations periods are applicable to the specific theories of recovery, however, and so we address Peters's claims count by count. We affirm the dismissal of counts seven and eight and affirm in part the dismissal of counts one through six. We reverse and remand only with regard to certain allegations (and their consequent injuries) contained in counts one through six.

I

In early 1983, the Welsh Development Agency ("WDA") solicited Frank Peters to build a computer diskette manufacturing plant in Wales, United Kingdom. A start-up venture, Parrot Corporation, Ltd., would own and operate the plant. Peters's role was to provide expertise in building and operating the plant. He also became an investor. WDA stated it was willing to invest £1,000,000 and would secure additional financing through outside investors.

WDA prepared an Investment Memorandum on July 18, 1983, which outlined the plans for the Parrot venture and asked the Development Capital Group ("DCG") to solicit additional investors. The outside investors eventually provided an additional £1,500,000 for the venture. WDA alone managed all contact with the investors. In the fall of 1983, Parrot also applied for a loan of approximately £2,500,000 from the European Coal and Steel Community ("ECSC").

---

* The Honorable William D. Stiehl, District Judge for the Southern District of Illinois, sitting by designation.

1. Except where appropriate to individually identify them, we hereafter refer to the appellants, Frank E. Peters and his wife Marta Chaikovska, singularly as "Peters."

2. The construction and adoption of reasonable inferences assumes a special importance in this appeal. Peters's amended counterclaim is riddled with logical inconsistencies and conclusory assertions unsupported by his statement of facts. We have attempted to give a reasonable construction to his allegations in a light most favorable to him, but we are under no obligation to repair or otherwise correct any party's poorly pleaded claim(s) for relief.

The Memorandum stated that the ECSC loan would be made through a clearing bank and that all funds raised from the investors and the ECSC would be available to Parrot for working capital and purchases of equipment. Peters suggested, based on past business and personal dealings, that WDA approach the Northern Trust Company to obtain a loan guarantee. A contact in Northern Trust's Chicago office referred Peters to John Iwanicki, a loan officer assigned to Northern Trust's London office. WDA provided Northern Trust with the Memorandum in Peters's presence, but it informed Northern Trust and Peters that WDA would not provide Peters with the Memorandum. WDA negotiated a loan guarantee from Northern Trust in the form of letters of credit on behalf of Parrot. At no time did Peters learn the contents of the Memorandum.

The investors agreed to enter into an Investment Agreement upon receipt of a satisfactory comfort letter from Northern Trust. On December 23, 1983, Northern Trust submitted a comfort letter to WDA. The comfort letter did not reference a 100% cash collateral requirement as a prerequisite to the letters of credit. On that same day, the investors, including Peters and his management team, entered into the Investment Agreement. Prior to this day, Peters had in his personal capacity borrowed £250,000 from Northern Trust's Chicago office to finance his purchase of Parrot stock. As of December 23, 1983, none of the investors knew that Northern Trust was prepared to issue the letters of credit only upon the condition that Parrot provide 100% cash collateral for the entire eight-year term of the ECSC loan.

Following the execution of the Investment Agreement, all of the investors placed their funds with Northern Trust's Chicago office, which then wired these funds to its London office on January 4, 1984. Northern Trust then disbursed the funds to Parrot to commence the venture.

On January 12, 1984, Iwanicki delivered a three-page letter to Peters and WDA dated December 22, 1983 (the "misdated letter"). This letter, unlike the comfort letter, detailed Northern Trust's 100% cash collateral requirement. (Prior to issuing the comfort letter and the misdated letter, Northern Trust had received the Memorandum, which stated that all funds raised for the Parrot venture would be available for use.) Peters did not know the contents of the Memorandum and thus was not aware of the discrepancy between the representations made in the Memorandum and the cash collateral requirement described in the misdated letter.

The collateral requirement prevented the Parrot venture from using approximately £2,000,000 of the funds it had raised from the investors and the ECSC. Inexplicably, neither WDA nor Peters, both of whom knew of the different terms stated in the comfort letter and the misdated letter, took any action to investigate and/or rectify this inconsistency. Northern Trust began the process of documenting and issuing the letters of credit.

In the summer of 1984, Peters informed Iwanicki that he would rely on Northern Trust's counsel to prepare documentation for the loan guarantees because Peters was unfamiliar with U.K. law and had previously relied on Northern Trust's counsel in the United States on other business matters. In order to issue the letters of credit, Northern Trust required, among other things, extracts of the minutes of Parrot's board of directors meetings, which would demonstrate that Parrot's board agreed to the terms of the loan guarantees. Northern Trust's counsel informed Northern Trust, but not Peters, that these extracts had to be presented in writing to the board for its approval.

On August 16, 1984, the Parrot directors met and authorized Peters to proceed with the letters of credit and ECSC loan transactions. The next day, Peters and WDA informed Northern Trust of the Parrot directors meeting. On August 21, 1984, Northern Trust submitted to Peters several documents concerning the loan guarantees, which they instructed him to sign and return to Northern Trust. Peters did so, and Northern Trust returned the documents to its counsel. Included in the documentation sent by Northern Trust to its counsel was an extract of the August 16 directors meeting prepared by Northern Trust's counsel and

requiring two of Peters's signatures (the "two-signature extract"). Though the two-signature extract purported to bear Peters's signatures, he had not received this extract on August 21. The signatures were forgeries.

A week later, Peters received from Northern Trust an extract of the August 16 Parrot directors meeting (the "August extract") with instructions to sign and return it. Peters signed the August extract on August 28, 1984—twelve days after the Parrot directors meeting—and returned it to Northern Trust. Northern Trust retained this extract and did not send it to counsel. Northern Trust delivered a second extract to Peters for his signature on February 28, 1985, (the "February extract") again after the relevant directors meeting had taken place. Peters's amended counterclaim does not state whether he signed the February extract, but the photocopy attached as an exhibit to the amended counterclaim appears to bear Peters's signature. We infer, then, that he signed the February extract and returned it to Northern Trust.

The Parrot venture began to experience cash flow problems in August 1985, and WDA approached the original investors for additional funds. The investors claimed no knowledge of Northern Trust's cash collateral requirement. The investors launched a fact-finding expedition and discovered the misdated letter in WDA's files. Upon inquiry, Peters explained that he did not receive the misdated letter until mid-January 1984. The investors demanded that WDA contribute additional funds to make good on the representations made in the Memorandum. WDA then began its own investigation of Parrot and Northern Trust.

WDA authorized Parrot's chairman, Donald Butterwick, to meet with Northern Trust and try to resolve the inconsistency between the comfort letter and the misdated letter. Northern Trust gave Butterwick the misdated letter, the August extract, and the February extract. Northern Trust did not give Butterwick the two-signature extract, nor did it inform Butterwick of the erroneous date on the misdated letter. Northern Trust led Butterwick to believe that the December 22 date was correct and that Peters had withheld the document.

Parrot fired Peters, and WDA subsequently referred the matter to British law enforcement authorities. On September 10, 1985, Peters was detained and questioned by police in Wales regarding £2,000,000 allegedly missing from Parrot. (These funds were on deposit with Northern Trust as collateral for the loan guarantees.) The police released Peters without arresting him, and he returned to the United States.

Peters contacted Iwanicki in October 1985 seeking written confirmation of the actual delivery date of the misdated letter. Iwanicki orally confirmed Peters's recollection of the delivery date, and Peters assumed that Northern Trust would make the same representation to the law enforcement authorities. Iwanicki conveyed Peters's request for written confirmation to at least one other Northern Trust employee on October 9, 1985, and confirmed to that person that Peters's version of events was correct. On November 9, 1985, Northern Trust's London office also confirmed the misdated letter's actual delivery date of January 12, 1984, to the Chicago office. Northern Trust failed, however, to disclose the actual delivery date of the misdated letter, existence of the two-signature extract, or the fact that the August and February extracts were drafted and signed after the respective directors meetings to WDA, Parrot, or DCG.

In July 1986, Northern Trust asked Peters, as the former representative of Parrot (their customer), for permission to discuss with law enforcement authorities its involvement with the Parrot venture. Peters gave his permission, and on July 7, British law enforcement authorities visited Northern Trust's Chicago office. The authorities granted Iwanicki and Northern Trust immunity from prosecution and conducted interviews. Northern Trust apparently released the two-signature extract to the police at this time but did not disclose that Peters's signatures had been forged.

Peters was named in a six count indictment on March 8, 1987, in Wales. Four charges of defrauding the institutional inves-

tors were later dismissed, and the prosecution went forward on the last two, which involved criminal forgery of the two-signature extract and the February 1985 extract. Peters was extradited by the United States to Great Britain in 1989. He was ultimately acquitted in 1991 after a jury trial in the Crown Court at Cardiff.

## II

Northern Trust subsequently sued Peters and his wife, Marta Chaikovska, on a promissory note they had given Northern Trust in consideration for the £250,000 loan. Peters and Chaikovska counterclaimed. The court granted summary judgment in favor of Northern Trust and, upon Northern Trust's motion under FED.R.CIV.P. 12(b)(6), dismissed the counterclaim because it failed to state a claim upon which relief could be granted that was not time barred. *Northern Trust Co. v. Peters*, No. 92–C–1647, 1993 WL 286488 (N.D.Ill. July 29, 1993). The court granted Peters leave to file an amended counterclaim, which alleged that the facts summarized above provided several grounds for recovery against Northern Trust. The court dismissed Peters's amended counterclaim on oral motion by Northern Trust because it saw nothing new in the amended counterclaim that rescued Peters's claims for relief from the time bar. Peters appeals the district court's dismissal of the amended counterclaim.[3]

## III

■ Our review of a district court's dismissal of a counterclaim is *de novo*. *City Nat'l Bank of Fla. v. Checkers, Simon & Rosner*, 32 F.3d 277 (7th Cir.1994). A complaint or counterclaim is subject to dismissal under Rule 12(b)(6) only if the nonmoving party can prove no set of facts consistent with its complaint or counterclaim that would entitle it to relief. *Warzon v. Drew*, No. 94–2687, 1995 WL 422847 (7th Cir. July 19, 1995). In reviewing a dismissal under Rule 12(b)(6), we are obliged to accept all well pleaded facts alleged in the counterclaim as true and draw all reasonable inferences in favor of the nonmoving party. *Id.* More is not necessarily better under the Federal Rules; a party "can plead himself out of court by unnecessarily alleging facts which . . . demonstrate that he has no legal claim." *Trevino v. Union Pac. R.R. Co.*, 916 F.2d 1230, 1234 (7th Cir.1990).

■ As we have noted, several of Peters's claims for relief rely upon conclusory statements of law. Such statements—and their unwarranted inferences—are not sufficient to defeat a motion to dismiss for failure to state a claim. *See Nelson v. Monroe Regional Med. Ctr.*, 925 F.2d 1555, 1559 (7th Cir.), *cert. denied*, 502 U.S. 903, 112 S.Ct. 285, 116 L.Ed.2d 236 (1991). "For the purpose of testing the trial court's action, well pleaded allegations of the complaint are to be taken as admitted, but mere unsupported conclusions of fact or mixed fact and law are not admitted." *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 565 F.2d 1194, 1198–99 (7th Cir.1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978).

## IV

The district court, using Illinois's most significant contacts choice of law rule, determined that the United Kingdom had the most significant contacts to this diversity case. Therefore, the court applied the substantive laws of the U.K. (including its statutes of limitation) to Peters's claims, except those claims brought under the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

---

**3.** Northern Trust argues that the district court did not allow Peters to amend his counterclaim and that we must therefore review the denial of leave to amend and examine it under an abuse of discretion standard. Peters filed his counterclaim on June 15, 1992. Northern Trust moved on August 27, 1992, to dismiss the counterclaim pursuant to Rule 12(b)(6), and the district court granted this motion on July 28, 1993. Peters then moved for leave to file an amended counterclaim, which Northern Trust promptly opposed.

Following a ten-month period of legal maneuvering concerning the motion for leave to amend and a motion for sanctions by Northern Trust, the district court on June 16, 1994, granted both Peters's motion for leave to file an amended counterclaim and an oral motion by Northern Trust to dismiss the amended counterclaim pursuant to Rule 12(b)(6). Therefore, we review directly the district court's dismissal of the amended counterclaim.

(1993), and the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* (1993). The parties do not contest the district court's choice of law, and we agree that the U.K. has the most significant contacts to the facts of this case. Therefore, we apply substantive U.K. law (applicable to England and Wales) to this appeal, except as to the claims under the Illinois statutes, to which we apply Illinois law.

## V

Peters's amended counterclaim alleges breach of contract, fraud, negligent misrepresentation, infliction of emotional distress, deceptive trade practices, defamation, forgery, and recoupment. These claims for relief sound in contract and tort. The Limitation Act 1980 (Eng.), which consolidated the several previous acts concerning limitation periods, provides six-year limitations periods for actions in tort and breach of contract. Limitation Act 1980 §§ 2, 5. Actions for negligence have a six-year limitation period, *id.* § 14A, and actions for libel or slander have a three-year limitation period, *id.* § 4A. The limitation period for fraud and deceptive trade practices in Illinois is five years. 735 ILCS 5/13–205 (1993).

Under U.K. law, where either the plaintiff's claim for relief is predicated upon the defendant's fraud or the defendant has concealed a fact relevant to the plaintiff's claim for relief, "the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it." Limitation Act 1980 § 32. *See also Gray v. T.P. Bennett & Son,* [1987] 13 C.L.R. 22 (Q.B.). A reasonably diligent person will inquire as to the merits of his potential claim when he learns of his injury—not when he learns the identity of the alleged wrongdoer. *R.B. Policies at Lloyd's v. Butler,* [1950] 2 All E.R. 266 (K.B.).

## VI

### A

The district court concluded that Peters could not assert any duty of good faith and fair dealing based upon the facts pleaded in his original counterclaim and his amended counterclaim. It correctly noted that a fiduciary relationship does not necessarily arise under U.K. law based upon a loan transaction between a bank and its customer. We believe that Peters may have a colorable claim arising out of Northern Trust's communications with British law enforcement authorities. It is not correct to deduce that because a fiduciary relationship does not attend every loan transaction it may not attend any loan transaction. The question is whether a special relationship and corresponding duty arose in the present case.

British courts have written that fiduciary relationships exist "in almost every shape," *Hedley Byrne & Co., Ltd. v. Heller & Partners, Ltd.,* [1963] 2 All E.R. 575 (H.L.), and a fiduciary relationship may exist when a bank undertakes to provide information to a person who it knows will rely on this information. *Id.* While that duty flows to the person receiving the information, a third party also relying on that information may enjoy the benefit of such a duty as well. *See, e.g., Commercial Banking Co. of Sydney, Ltd. v. R.H. Brown & Co.,* [1972] 2 Lloyd's L.R. 360, 364 (Aust.H.C.) ("It is not necessary for liability that the misrepresentation should be made directly, it can be made to one, to be passed on to another."). While the district court's statement of the general rule concerning the scope of a bank's fiduciary duty to its customer is correct, we must disagree with its application of that general rule given the facts and procedural posture of this particular case.

A fiduciary relationship may not, however, be necessary to Peters's claims for relief. Northern Trust may have owed Peters a duty of care in making certain disclosures to British law enforcement authorities and other parties inquiring about the Parrot venture. A bank owes its customers a duty of care in the handling of their accounts, *Barclays Bank PLC v. Quinecare, Ltd.,* [1992] 4 All E.R. 363 (Q.B.), and a duty of confidentiality in not disclosing information to third parties. *Tournier v. National Provincial and Union Bank of England,* [1924]

1 K.B. 461. It may follow, then, that when a bank does disclose information to third parties, it assumes a duty to do so honestly and so as not to injure or impair its customer's interests. "A bank owes its customer a duty to take reasonable care and skill in interpreting, ascertaining and acting in accordance with the instructions of the customer." *Redmond v. Allied Irish Banks PLC*, The Times, 5 June 1987. *See also Selangor United Rubber Estates v. Craddock*, [1986] 2 All E.R. 1073.

Peters gave Northern Trust permission to discuss with third parties its business dealings with him. There is a reasonable inference that implicit in this permission was an instruction to be honest and forthcoming. Asking Peters to waive the cloak of confidentiality may have imposed on Northern a duty of care in whatever disclosures it made on the basis of that waiver. Peters may therefore have a cause of action arising out of any false or fraudulent statements subsequently made by Northern Trust to those third parties. His allegations, taken at face value, support a reasonable inference that Northern Trust's communications to those parties initiated a duty of honesty and care. *See Hedley Byrne*, [1963] 2 All E.R. 575 ("There is the general duty of common honesty, and that duty of course applies in the circumstances of this case as it applies to all other cases."). Peters may obtain relief if he proves that Northern Trust owed him such a duty and breached that duty through conduct that gives rise to claims not barred by the relevant limitation period.

**B**

Peters filed his original counterclaim on June 15, 1992, and each count will be time barred if its applicable limitation period ends prior to this date. In his amended counterclaim, Peters alleges eight counts of wrongful conduct by Northern Trust. Incorporated in these eight counts are fourteen alleged injuries, and several of the injuries support multiple theories of recovery. We examine the

set of facts giving rise to each alleged injury to determine whether the corresponding claim for relief is time barred. Mindful that the district court must once again struggle through this case and apply our judgment on remand, we organize our discussion by count despite the resulting repetition.

*Count One: Breach of Contractual Duty*

■ Peters alleges that Northern Trust breached its duty of good faith and fair dealing flowing from its relationship with him. This alleged breach consisted of: (1) Northern Trust's failure to advise Peters of the inconsistencies between the Memorandum and its own cash collateral requirement when it loaned money to him knowing he would use those funds to purchase Parrot stock; (2) Northern Trust's failure to provide Peters with "the promised high levels of professional service" in the course of their relationship; (3) Northern Trust's presentation of false and/or misdated documents to Peters and transmission of false, misdated, and/or forged [4] documents to its legal counsel; (4) Northern Trust's demand of Peters for payment on his outstanding debt obligations to Northern Trust and its misapplication of his remittals; and (5) Northern Trust's concealment of its alleged wrongdoing during the course of its relationship with Peters and his subsequent indictment and criminal trial in the U.K. Actions for breach of contract have a six-year limitation period. Limitation Act 1980 § 5.

In August 1985, the original investors were solicited for additional funds, and they asked Peters about the cash collateral requirement, which they had not known about prior to this time. At that point, Peters explained that the misdated letter detailing the collateral requirement did not come into his possession until mid-January 1984. It was August 1985, therefore, when Peters learned of the discrepancy between Northern Trust's cash collateral requirement and the information contained in the Memorandum. Peters also had

---

4. Peters alleges injuries arising out of Northern's acts of forgery in count seven of his amended counterclaim. We use the term "forgery" in our discussion of counts one through six and refer to its conventional meaning: "The false making or

the material altering of a document with the intent to defraud. A signature of a person that is made without the person's consent and without the person otherwise authorizing it." BLACK's LAW DICTIONARY 650 (6th ed. 1990).

known since July 1983 or thereabouts that Northern Trust had a copy of the Memorandum in its possession. It is therefore unreasonable to infer that as of August 1985, when Peters learned of the inconsistent facts contained in the misdated letter and the Memorandum, he either did not know or should not have known through reasonable diligence that Northern Trust was aware of this discrepancy. Claims based upon this conduct are barred by the limitation period.

■ Peters claims that he did not learn of the discrepancy between the terms of Northern Trust's letter of credit and the information contained in the Memorandum until his criminal trial began in 1991. This conclusory assertion is inconsistent with Peters's own recitation of the facts and insufficient to defeat a motion to dismiss under Rule 12(b)(6). *See Tamari*, 565 F.2d at 1198–99. Peters also alleges that he exercised reasonable diligence to ascertain the facts as regarded the "Parrot transaction." It is unreasonable to infer that the investors' actions in August 1985 were inadequate notice to Peters that the Memorandum did not reflect the actual terms of Northern Trust's loan guarantee. Even if the investors' actions were inadequate for that purpose, any reasonable diligence consisting of inquiries directed either to Northern Trust, WDA, or the other investors would have revealed the discrepancy. It is unreasonable to infer that Peters did not know, or reasonably should not have known, of Northern Trust's alleged bad faith as of August 1985.

■ Second, Peters alleges that Northern Trust "fail[ed] to provide to Peters the promised high levels of professional service and experience, but instead administer[ed] the arrangements in an imprecise, incomplete, unprofessional, negligent, and improper manner toward Peters." However, he fails to identify which of Northern Trust's actions constituted this conduct. This conclusory assertion of mixed law and fact, absent any underlying factual allegations, does not sustain Peters's claim.

■ Third, Peters alleges that Northern Trust "provid[ed] Peters with false documents with instructions to sign and return them to Northern Trust." The documents to which Peters refers are the revised extract of the August 16, 1984, Parrot directors meeting and the extract of the February 1985 Parrot directors meeting. Peters's counterclaim states only that he was asked to sign the revised extract for the August 16 directors meeting; only by recourse to his exhibits can we deduce that he also signed the February extract. Peters attended both the August 1984 and February 1985 directors meetings, and he reasonably should have known when he signed the extracts that they falsely stated that they had been submitted to the Parrot directors during that meeting. This claim is also barred by time.

■ Fourth, Northern Trust allegedly allowed Peters's signature to be forged on the two-signature extract that Northern Trust eventually turned over to British police. If, as Peters maintains, Northern Trust did not use this extract outside of its offices until turning it over to police, it is doubtful whether Peters reasonably could have discovered its existence before he was indicted. Peters does allege that he did not learn of the two-signature extract's existence, and consequently his forged signatures, until January 1991. Peters's 1987 indictment notified him that an extract signed by him between August 1 and October 31, 1984, was allegedly a false instrument. Peters states that he did sign the August extract on August 22, and it is reasonable to infer that he assumed this extract to be the one referenced in his criminal indictment. Thus, the indictment did not constructively notify Peters of the existence of the two-signature extract, and we must take as true his allegation that he did not learn of the two-signature extract's existence until January 1991. Thus, his claims based upon Northern Trust's alleged forgery of his signature upon the two-signature extract are not time barred.

■ Fifth, Peters alleges that Northern Trust "misdat[ed] the misdated letter [and] ... actively conceal[ed] the actual delivery date of the misdated letter from 1985 until well after June 15, 1986." Peters knew about the misdated letter, however, when he received it from Iwanicki on January 12, 1984. Peters also knew when he was fired in

late 1985 that one reason for his firing was that Parrot and WDA perceived the letter as properly dated. Peters admits that in October 1985 he contacted Iwanicki seeking his assistance in resolving the misunderstanding surrounding the misdated letter. Based upon Peters's own recitation of the facts, his claims based on this alleged conduct are time barred.

### Count Two: Fraud

This count incorporates many of the same factual allegations as count one. Peters alleges that Northern Trust committed fraud in two ways: (1) it failed to disclose the terms and conditions of its loan guarantee when it issued the comfort letter on December 23, 1983, knowing Peters would proceed to borrow funds from Northern Trust in reliance on the comfort letter; and (2) it presented a false extract to Peters for his signature and transmitted the forged two-signature extract to counsel when it knew or should have known that such actions exposed Peters to criminal liability. Peters claims to have suffered personal and professional losses as a result of these acts. The limitation period for fraud is six years. Limitation Act 1980 § 2.

These allegations and their limitation period duplicate certain allegations in count one. Peters knew or should have known of Northern Trust's failure to disclose the terms and conditions of its loan guarantee as of August 1985 when the investors approached him to inquire about Parrot's need for additional funds, and claims based upon this alleged conduct are barred by time. Peters also knew or should have known that the August extract was false when he received it, since he had attended the directors meeting it purported to record; this claim is also time barred. Claims based upon Northern Trust's transmission of the two-signature extract containing the alleged forgeries of Peters's signature are not time barred for the reasons discussed above.

### Count Three: Negligent Misrepresentation

Peters alleges in count three several instances of negligent misrepresentation by Northern Trust. He claims: (1) that North-

ern Trust loaned him money to purchase Parrot stock and required that Chaikovska cosign the note when it knew of the discrepancy between the misdated letter and the Memorandum; (2) that Northern Trust negligently misrepresented the terms and conditions of its loan guarantee in the comfort letter; (3) that Northern Trust negligently failed to record the actual issue date of the misdated letter and failed to respond to Peters's request for confirmation of the actual date of issue; (4) that Northern Trust negligently misrepresented to Peters that the revised August 1984 extract was requested by counsel; (5) that Northern Trust negligently misrepresented to counsel that Peters had signed the two-signature extract; and (6) that Northern Trust failed to disclose the true date of the misdated letter to any concerned party during the course of the several investigations into Parrot's financial meltdown. Negligent misrepresentation has a six-year limitation period. Limitation Act 1980 §§ 2, 14A.

Peters learned or should have learned of the discrepancy between the misdated letter and the Memorandum in August 1985. He also learned that the comfort letter did not contain Northern Trust's terms and conditions for the loan guarantee when he received the misdated letter in January 1984. He also knew or should have known at that time of the erroneous date on the misdated letter and knew or should have known by June 1986 that Northern Trust had failed to respond to his October 1985 request for confirmation of the actual date of the misdated letter. Peters also knew, or should have known through reasonable diligence, at the time he was fired by Parrot that Northern Trust might not have been truthful with Parrot or WDA during their investigations. Claims arising from injuries based upon these acts are barred by the limitation period.

As we have written above, it is reasonable to infer from Peters's factual presentation that he did not learn of the two-signature extract's existence until his trial in 1991. Nor might he reasonably have known prior to that time that Northern Trust's counsel did not request the revised August extract.

Claims based upon this allegedly wrongful conduct are not time barred.

It is also reasonable to infer that Peters might not have known by June 15, 1986, that Northern Trust had negligently misrepresented to law enforcement authorities its knowledge of the facts surrounding the Parrot–WDA loan transaction. Northern Trust requested Peters's permission to discuss its involvement in the Parrot transaction with law enforcement authorities in July 1986, and Peters may reasonably not have known prior to that time that Northern Trust would make factual misrepresentations to the law enforcement authorities. Claims based upon this alleged conduct are not barred by the limitation period.

### Count Four: Infliction of Emotional Distress

Peters alleges in count four that Northern Trust inflicted emotional distress upon him and his wife by concealing the true issue date of the misdated letter and by using false and/or forged extracts of the Parrot directors meetings. The Limitations Act provides a six-year period for bringing claims of infliction of emotional distress. Limitation Act 1980 § 2.

Peters does not specify from whom Northern Trust allegedly concealed this information. To the extent that he claims concealment from himself and/or his wife, only claims arising from the two-signature extract are viable; the remaining claims are barred by time. To the extent, however, that Peters claims concealment from any of the several parties conducting investigations into the Parrot venture, only the claims covering Northern Trust's alleged concealment from British law enforcement agencies remain viable.

### Count Five: Deceptive Trade Practices

Peters alleges in count five that Northern Trust engaged in deceptive trade practices in violation of Illinois law when it loaned him money in December 1983. He alleges that, both at the time Northern Trust loaned him funds to purchase Parrot stock and thereafter, Northern Trust failed to provide him and Chaikovska with accurate and complete information regarding the facts of the WDA–Parrot transaction. The limitation period for deceptive trade practices in Illinois is five years. 735 ILCS 5/13–205 (1993). Thus, Peters's claim is viable only if he learned of it after June 15, 1987.

Peters alleges a "continuing failure to provide [him and Chaikovska] accurate and complete information." As we have discussed in our treatment of counts one through four, Peters knew of certain allegedly deceptive trade practices by Northern Trust prior to June 1987, namely by virtue of the investors' inquiry in August 1985 and his receipt of the August and February extracts in 1984 and 1985, respectively. To the extent that his claim relies upon these facts, it is time barred.

Peters's allegation seems also to encompass Northern Trust's alleged failure to disclose to him its forgery of his signature on the two-signature extract and its alleged concealment of certain facts from the law enforcement authorities. As we stated previously, Peters may reasonably not have known of the existence of the forged two-signature extract until his trial in 1991, and claims based upon Northern Trust's alleged forgery of this document are not time barred. Peters did know in July 1986, however, that Northern Trust was discussing the Parrot transaction with law enforcement authorities, and he reasonably should have deduced from his March 1987 indictment that Northern Trust may not have been truthful with the authorities about his role in the transaction. Claims under Illinois law based upon this alleged conduct are barred by time.

### Count Six: Defamation

Peters alleges in count six that Northern Trust provided false and/or forged documents to WDA knowing that these documents would be used in civil and/or criminal proceedings and that they would "subject Peters to public ridicule, disgrace and humiliation." Furthermore, Peters alleges that Northern Trust failed over a five-year period to correct the false impression created by these documents. Section 4A of the Limitation Act 1980 provides a three-year period

for claims of libel or slander (synonymous with defamation), and Peters's claim must therefore have accrued on or after June 15, 1989.

Peters either knew, or should have known through reasonable diligence, at or about the time he was fired in late 1985 that Northern Trust might have provided the August and February extracts and/or the misdated letter to WDA. His termination was allegedly predicated upon information provided by Northern Trust to WDA and Parrot. Any reasonably diligent investigation by Peters would have uncovered the possibility that Northern Trust might have provided the August and February extracts and/or the misdated letter to WDA. In fact, Northern Trust's failure to respond to Peters's request in October 1985 for confirmation of the misdated letter's actual delivery date, in light of his subsequent termination, should have led Peters to exercise reasonable diligence to ascertain whether Northern Trust had been truthful with WDA. Claims based upon the provision of these documents are therefore barred by time. Again, however, we must remand on the two-signature extract because it is not reasonable to impute knowledge of that document's existence to Peters prior to his criminal trial in 1991.

### Count Seven: Forgery

Peters alleges in count seven that Northern Trust forged his signatures on the two-signature extract and used the extract in the loan guarantee transaction and that he suffered substantial damages as a result. He alleges that but for this act of forgery, he would not have been indicted for violations of U.K. law. This count does not present a cognizable claim for relief.

■■■ Forgery is not itself a cause of action under English tort law; rather, it may form the basis for one of several actions in tort. *See, e.g., Williams and another v. Wolman and another,* Ct.App.Ch.Div. January 30, 1990 (defamation); *Alman & Benson v. Associated Newspapers Group, Ltd.,* Ch.Div. June 20, 1980 (same); *Armagas, Ltd. v. Mundogas SA,* [1985] 3 All E.R. 795 (fraudulent misrepresentation). Peters has, in fact, alleged in several counts that Northern Trust's acts of forgery caused him injuries, and these claims for relief under English tort law are each governed by their own statute of limitation.

### Count Eight: Recoupment

■■■ Peters alleges in count eight that he and Chaikovska are entitled to recoup from Northern Trust all damages it claimed in its original complaint. Recoupment is a defense applicable in situations where the same transaction or contract gives rise to the claims asserted in an original complaint and a subsequent counterclaim. It involves the right of the defendant to have the plaintiff's monetary claim reduced by virtue of a claim by the defendant against the plaintiff arising out of the same contract. Northern Trust's original complaint was based upon the promissory note executed by Peters and Chaikovska. Peters's amended counterclaim alleges liability predicated upon Northern Trust's actions exclusive of the promissory note. Therefore, the claim of recoupment was improperly pleaded and is not viable.

### VII

Peters alleges in his amended counterclaim several theories of recovery for an assortment of injuries arising from Northern Trust's wrongful conduct. The district court labored mightily through Peters's mountain of factual allegations and concluded that his claims under a breach of contract theory were baseless and that his other claims were barred by the applicable limitation periods. As shown in the discussion above, under our *de novo* review, we agree in part with the district court's Rule 12(b)(6) dismissal. However, we are forced to the conclusion that some of Peters's claims for relief that arise out of the two-signature extract, Northern Trust's statements to Peters about its counsel's request for the August extract, and Northern Trust's communications with the British law enforcement authorities concerning Peters's role in the Parrot venture remain viable.

We therefore reverse the district court's dismissal of Peters's amended counterclaim only with regard to the specific claims for

relief based upon the following alleged conduct by Northern Trust: (1) its forgery of Peters's signature on the two signature extract and subsequent presentation, transmission, and/or concealment of that extract for any purpose involving any party; (2) its misrepresentations to Peters that its counsel had requested the August extract; and (3) its misrepresentations and/or concealment of facts in communications with British police concerning Peters and his actions as an investor in, and manager of, the Parrot venture only so far as such misrepresentations and/or concealment support Peters's claims for relief under U.K. law. We affirm the district court's dismissal of all other claims for relief arising out of any conduct by Northern Trust not specified in this paragraph.

The district court may in its discretion order Peters to consolidate, clarify, and otherwise clean up his amended counterclaim so as to facilitate the resolution of this case in a manner consistent with this opinion. Peters is precluded, however, from resurrecting any of the time-barred claims by alleging a conspiracy or continuing cover-up.

The district court's dismissal of Peters's amended counterclaim is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.